# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1691-24

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

    Plaintiff-Respondent,

v.

A.I.C.,

    Defendant-Appellant,

and

S.G.,

    Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF T.C.,
a minor.

_____

Submitted October 9, 2025 – Decided October 30, 2025

Before Judges Marczyk, Bishop-Thompson, and Puglisi.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Monmouth County, Docket No. FG-13-0043-24.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Christine Olexa Saginor, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Christopher Weber, Assistant Attorney General, of counsel; Renee Greenberg, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minor T.C. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Jennifer M. Sullivan, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant A.I.C. (Amy)[1] appeals from the Family Part's January 21, 2025 judgment of guardianship terminating her parental rights to her son, T.C. (Theo), born of her relationship with S.G. (Steve).[2] Following our review of the record and applicable legal standards, we affirm.

---

[1] We use initials and pseudonyms to protect the privacy of the family. R. 1:38-3(d)(12).

[2] In October 2024, Steve executed an identified surrender of his parental rights to S.R. (Sherri), Theo's resource parent and maternal cousin, to allow Sherri to adopt Theo. He did not participate in this appeal. Amy and Steve have another child together, who is not subject to this appeal.

# I.

## A. Background and the Division's Early Involvement.

Amy is the biological mother of Theo, who was born in November 2019. The New Jersey Division of Child Protection and Permanency (Division) first became involved with Amy in January 2021 when it received a referral concerning her substance abuse, allegations of physical abuse toward Theo's older sister, and inadequate supervision. During the Division's investigation, Amy acknowledged she had a history of mental health issues, including anxiety and depression. She admitted she used marijuana to help her sleep at night, but claimed she did not use it in front of her children or to feel "high." Amy further stated she was interested in obtaining a medical card for her marijuana use. The Division found the substance abuse allegations to be "not established" and the physical abuse allegations to be "unfounded." However, it kept the family's case open to provide services.

After its initial investigation, the Division referred Amy to the Mental Health Association (MHA), which could assist her with housing, employment, childcare, and mental health treatment. While Amy initially refused to engage with the MHA, she eventually met with the organization in early 2021 to discuss services. Thereafter, between March and June 2021, Amy's engagement with

A-1691-24

the MHA was inconsistent. Moreover, the Division requested Amy undergo a substance abuse evaluation (SAE), which Amy denied needing and refused to undertake.

Throughout this time, the Division had difficulty keeping in contact with Amy, as she did not always have a working phone number. Accordingly, the Division obtained a laptop for her so it could maintain contact with her. Moreover, the Division expressed concerns regarding Theo's medical care, noting he was not up to date on immunizations or "well visits," and that Amy did not consistently address his upper respiratory issues. In response, the Division referred Amy to its Child Health Unit (CHU) to help her schedule medical appointments, arrange transportation, and ensure compliance with medical recommendations. Early intervention services for Theo were also considered, but Amy asserted such services were unnecessary for him.

The Division also arranged to provide Amy with a crib for Theo after noting he had grown out of the pack-and-play, but Amy declined because she was moving residences. Amy often moved, staying with relatives at times or in motels.

4

B.  Theo's Removal, Early Visitation, and Resource Placement.

On or about July 12, 2021, the Division received a new referral concerning Theo's health and location, claiming Amy could not be reached after leaving Theo with his babysitter.  The Division investigated and attempted to contact Amy, but it was unsuccessful.  The Division ultimately found Theo at his babysitter's home, where he had been for a few days, while Amy's location remained unknown.

On July 13, 2021, the Division executed an emergency removal of Theo and placed him with his maternal aunt.  Amy did not re-establish contact with the Division until July 14.  She provided two conflicting phone numbers, but advised her number often changed.  She informed the Division she was living with her cousin Sherri at that time, though she could not remember the address, then later advised she was at her grandmother's house.  The trial court upheld the Division's removal on July 15, finding Amy had "disappeared," left her children in the care of others with no way to contact her, and lacked stable housing.

Following Theo's removal, the Division immediately arranged supervised visits between Amy and Theo and provided transportation for Amy.  The first visit was scheduled for July 22, 2021, which Amy missed.  Amy attended the

A-1691-24

second visit but became "very combative," refused to let the Division's caseworker transport her back home, and threatened the worker "that if she finds out where [the worker] lives, she will be coming to [the worker's] house because [the Division] got her kids."  The next day, when a different Division worker went to pick Amy up for her visit, while Theo and Theo's sister were in the car, Amy and a friend "aggressively" approached the worker's car, appearing "prepar[ed] to fight."  However, Amy's attitude changed when she realized it was not the same caseworker as the day before.

On August 11, 2021, the trial court ordered Amy to attend and complete an SAE, speak with the Division's domestic violence liaison, engage with the MHA, confirm and attend supervised visits with her children at least three times per week, and maintain weekly contact with the Division.  Moreover, given the prior security concern, the court ordered the Division to cease transporting Amy to visits and instead provide her with bus passes.

In August 2021, the Division moved Theo to Sherri's home where he has since resided.  Sherri was informed about Theo's medical needs and followed up with his care, locating specialists for him.  Earlier that month, prior to Theo's placement with her, Sherri allegedly indicated to the Division she was willing to let Amy and Theo live with her.

6

C. Amy's Response to Division Services.

Between August 2021 and January 2022, the Division offered housing assistance, mental health services, and substance abuse services to Amy per the court's August 2021 order, however, Amy was inconsistent in her engagement or non-compliant with such services. For example, the Division had to refer Amy three times for an SAE before she complied on December 14, 2021; she was recommended for level one outpatient treatment at that evaluation but refused to comply.

By October 2021, despite the Division providing Amy with bus and train passes, her court-ordered visitation with Theo was reduced from three times per week to once per week due to her lack of consistent attendance, and the court ordered the visits to only take place if she confirmed them in advance. Thereafter, Amy refused to attend any supervised visits throughout the rest of 2021. The Division also re-referred Amy to the MHA, which agreed to re-open her case contingent upon her cooperation. However, by January 2022, Amy's case was closed out again because of "loss of contact." During this time, Amy also was uncooperative in attending family team meetings with the Division. In November 2021, the Division referred Theo to early intervention services, and

7

he was diagnosed with a developmental delay and began receiving speech therapy, physical therapy, and occupational therapy.

In February 2022, Dr. David Brandwein, Psy.D., conducted a psychological evaluation of Amy.[3] During the evaluation, Amy informed Dr. Brandwein she was unemployed, lacked stable housing, had some legal issues, used marijuana daily, had a history of self-harm, attempted suicide at least three times, and "hear[s] voices sometimes." She acknowledged she had been ordered to complete level one outpatient treatment but stated she would not attend because she instead planned to seek a medical marijuana card.

Dr. Brandwein concluded Amy could not be an independent caretaker for Theo and recommended she only have visits with Theo supervised by the Division. He recommended Amy undergo a psychiatric evaluation, participate in individual therapy with either a cognitive behavioral therapy (CBT) or dialectical behavioral therapy (DBT) component, and complete parenting education classes. He further recommended she submit to random drug tests, undergo an updated SAE, and engage in consistent visitation with Theo. Dr. Brandwein also recommended, if Amy chose to pursue a medical marijuana

---

[3] This evaluation was rescheduled from December 2021 after Amy failed to attend that appointment.

A-1691-24

card, she should disclose her history of hearing voices to the evaluating medical professionals. He cautioned, given Amy's mental health history, marijuana use may lead to increased psychotic symptoms.

The Division discussed the evaluation with Amy, who disagreed with Dr. Brandwein's report. Thereafter, and throughout 2022, the Division continued to refer Amy to the services recommended by Dr. Brandwein, but Amy's participation was marked by varying levels of inconsistency and non-compliance.

Amy continued to miss scheduled supervised visits with Theo through May 2022. Despite requesting the Division change the office location of the visits in April 2022, Amy nonetheless did not attend a supervised visit until June 2022. However, Amy did attend Theo's adenoid surgery in May 2022.

In July 2022, the trial court granted the Division a three-month extension to effectuate reunification and implement a permanency plan for Theo, noting Amy's "willingness to become more engaged." Amy's participation in supervised visits remained inconsistent throughout the rest of the year. Amy contacted the Division in August 2022 to discuss medical concerns related to her sickle cell disease. In response, the Division scheduled both a virtual and in-person meeting to address expectations and Amy's concerns. The Division

referred Amy to a parent support program at Catholic Charities, but she was closed out in September 2022 for lack of communication. While Amy eventually completed a parenting class at the Ocean Family Success Center (OFSC), she did not complete any additional programs with the organization after walking out of a family team meeting in January 2023.

Amy did not attend any scheduled visits with Theo in September 2022, despite the Division's attempt to coordinate a better schedule for her. While Amy attended more visits between October and November 2022, she missed others, including Theo's birthday visit. Moreover, Amy canceled three visits in December and left another early, claiming she had "to go to the hospital for [her] depression." During that time, the Division visited Amy at her then-boyfriend's home to discuss steps to reunify her with Theo at that location, the importance of consistent visitation, and later to provide housing services when that residence was not approved for Theo.

In October 2022, Amy attended a psychiatric assessment, where she was diagnosed with post-traumatic stress disorder (PTSD) and bipolar disorder. The Division referred Amy to Stress Care for CBT therapy, but she was subsequently closed out after not attending. She engaged in medication management through

December 2022. However, Amy never attended the level one outpatient treatment as recommended by the SAE.

In January and February 2023, Amy's visitation with Theo remained inconsistent. She also had difficulty parenting Theo and his sister during these visits, and once told them she would "call the police" if they misbehaved. In January, the Division and additional support programs tried to discuss services and address visitation compliance with Amy but were unsuccessful, as she became defensive, unable to have a productive conversation, and left the meeting early.

In February 2023, Theo continued to experience ongoing health and behavioral challenges. He required follow-up care with multiple specialists, including pulmonology, nephrology, otolaryngology, cardiology, neurodevelopment professionals, and a genetic specialist. Sherri coordinated these appointments in collaboration with the Division and expressed her ongoing resolve to address Theo's complex medical needs. During this time, Sherri reaffirmed her commitment to adopting Theo, advising the Division she was not interested in kinship legal guardianship (KLG). The Division, Sherri, and the CHU also kept Amy informed of Theo's medical conditions throughout 2023.

The Division also continued to try to connect Amy with needed services throughout 2023, including referrals for therapeutic visitation, individual therapy, updated SAEs, and various family team meetings. Amy's participation in medication management through Stress Care was inconsistent that year. Upon learning Amy had been hospitalized for suicidal ideations in February, the Division re-referred Amy to Stress Care for CBT therapy as she was already involved in their medication management services, but Amy did not attend.

In April 2023, the Division also referred Amy to the Children's Home Society Reunification Program and to the OFSC for therapy, parenting skills, and therapeutic visitation, but she did not complete intake sessions and was closed out for non-compliance.

Amy attended an updated SAE in April 2023, where she tested positive for marijuana and was recommended to attend level one outpatient treatment. The Division made multiple referrals for treatment and emphasized the importance of compliance, but Amy did not engage as required, resulting in her discharge from the provider in June 2023 for non-participation.

In July 2023, the trial court again granted the Division another three-month extension to effectuate reunification, noting Amy had recently been

hospitalized for mental illness and still lacked stable housing, despite referrals by the Division.

In May 2023, Theo underwent genetics testing, which Amy attended. Thereafter, in July 2023, Theo was diagnosed with Hunter Syndrome, which is a rare, life-limiting, genetic disorder that affects various bodily functions and requires substantial medical care. Individuals diagnosed with Hunter Syndrome have a life expectancy of ten to twenty-one years. The Division explained the diagnosis to Amy and organized centralized care for Theo at St. Peter's Hospital, including weekly enzyme treatments to slow the disease's progression. After Theo's diagnosis, Sherri reiterated her intent to adopt Theo and continued to monitor Theo's health and bring him to appointments.[4]

Amy's participation in supervised visitation with Theo remained inconsistent throughout the remainder of 2023. The Division invited Amy to Theo's genetics appointment in October 2023, but the appointment was nearly canceled due to Amy arriving late.

On January 3, 2024, the trial court approved the Division's permanency plan to terminate Amy's parental rights and allow Sherri to adopt Theo. The

---

[4] Sherri expressed initial concern about managing Theo's treatments because she could not miss work and did not drive; however, she nonetheless reiterated her commitment to caring for Theo and his medical needs.

court reasoned termination was appropriate because Amy had not remediated the concerns that led to Theo's removal, noting her failure to engage in substance abuse treatment and noncompliance with mental health services. On March 1, the Division filed a complaint for guardianship. On May 15, the protective services litigation was terminated.

Throughout 2024, Amy continued to receive bus and train passes from the Division. She continued to inconsistently attend Division supervised visits with Theo through July 2024.

Amy missed an SAE appointment in February 2024, but she did engage in an updated evaluation by the spring that year. Despite claiming she no longer was using marijuana as of January 2024 and producing some negative drug tests, Amy also had one positive test, and Division workers noted "a strong odor of marijuana coming from [her]" during this timeframe. Amy was again referred for level one outpatient treatment and provided with a list of providers, but she refused to attend.

In March 2024, Theo began receiving weekly enzyme treatments for his Hunter Syndrome, which Sherri attended with him. In April 2024, Amy attended Theo's port surgery. However, she did not return the next day for the corrective procedure he required, although she consented to the procedure by phone.

 A-1691-24

In early 2024, the Division referred Amy to the YMCA for CBT/DBT therapy after she began having issues with her therapy at Stress Care. However, Amy was non-compliant, and the YMCA closed her out in April 2024. That month, Amy informed the Division she had found her own virtual therapist at Positive Reset. Amy attended consistently for a few months before she was placed on a "no schedule list" for failure to pay her account balance, at which point the Division referred Amy back to the YMCA, which offered free services. After the YMCA made contact in September 2024, Amy attended a few appointments but was later placed on a waitlist after requesting a new therapist. By December 2024, Amy was no longer engaged with the YMCA but was generally consistent with her medication management at Stress Care.

In July 2024, Amy underwent an updated psychological evaluation and comparative bonding assessment with Dr. Brandwein. He found no substantive improvements in Amy's parental capacity or psychological functioning since his initial assessment. He concluded there was no evidence proving Amy had remediated the Division's concerns that led to Theo's removal in 2021, citing her refusal to engage in substance abuse treatment, lack of stable housing, and inconsistent engagement with mental health services. Given Theo's special needs and required medical care, Dr. Brandwein determined Amy could not be

15

an independent caregiver for him at the time of that evaluation or in the foreseeable future.

In conducting the bonding evaluations, Dr. Brandwein observed Amy struggled to regulate Theo's behavior and found no evidence of a secure parent-child bond between Amy and Theo. Comparatively, he found Sherri and Theo shared a secure bond. Thus, Dr. Brandwein opined termination of Amy's parental rights would not cause Theo to suffer psychological harm and recommended termination so Sherri could adopt Theo.

D. The Guardianship Litigation.

The guardianship trial was held over four nonconsecutive dates between October and December 2024. The Division presented testimony from several witnesses, including Sherri, Theo's resource parent and current caregiver. The Division also called: the intake worker during the Division's early involvement with Amy's family; the permanency caseworker who managed Theo's transition to placement with Sherri; the permanency caseworker who supervised the case as it progressed towards guardianship; and the current adoption worker who testified regarding permanency planning and Amy's compliance with services. The Division's psychological expert, Dr. Brandwein, testified about his evaluations of Amy and his bonding assessments for both Amy and Sherri. The

Law Guardian relied on the Division's witnesses. Amy did not testify and presented no witnesses or evidence at trial.

Sherri testified in detail about her role as Theo's caregiver since August 2021 and her commitment to Theo's wellbeing. She described Theo as "outgoing" and "fun to be around." She explained Theo's speech was delayed, but she was able to understand him by observing him and communicating through American Sign Language.

Sherri testified about Theo's Hunter Syndrome diagnosis and the weekly enzyme treatments she attended with Theo, which required him to be connected to an IV bag for four hours per session. She recounted these treatments wipe Theo out immediately after but then keep him up all night. Sherri explained she must sleep lightly to hear Theo when he wakes up in the middle of the night. Even though she did not drive, Sherri explained she either used medical transportation or paid someone out of pocket to get Theo to his weekly treatments. She testified, despite having been invited to do so, Amy never attended any of Theo's weekly enzyme treatments during the past six months he had been receiving them. Moreover, Sherri explained Theo also received speech therapy, physical therapy, and saw a cardiologist, allergist, hematologist, ear

17

specialist, and his regular pediatricians. Sherri administered Theo's daily blood pressure, allergy, and asthma medications.

Additionally, Sherri testified she understood the differences between KLG and adoption. She explained her desire to adopt Theo "so he could be stable" and so she could continue to tend to his medical needs and ensure his happiness. When asked if she would still care for Theo if the court ordered KLG, despite her preference for adoption, Sherri stated she "would have to. Who else is going to do it." She testified she intended to continue Theo's visits with his sister after adoption and would be open to contact between Theo and his biological parents.

The intake caseworker testified about the Division's early involvement with the family between February 2021 and July 2021. She discussed the events that led to Theo's removal from Amy's custody and outlined the services the Division offered to Amy both before and after Theo's removal. The caseworker testified Amy lacked stable housing throughout her involvement in the case, explaining Amy lived intermittently with friends, family, or in motels. She stated the Division provided Amy with a laptop so it could communicate with her, but Amy nonetheless did not respond to the Division's communication attempts. Moreover, she testified the Division offered Amy supervised visits, SAEs, and MHA referrals, but Amy initially denied the need for services and

refused to participate in them. The caseworker testified she was removed from the case after Amy became aggressive toward her in July 2021.

The first permanency caseworker testified about his involvement with the family from August 2021 to January 2022. He explained there were several outstanding services for Amy when he initially became involved, including an SAE, mental health referral, and consistent participation in supervised visits with Theo. The caseworker testified he re-referred Amy for an SAE because she had missed appointments, although she did complete an evaluation by the end of 2021. He also described difficulties communicating with Amy, highlighting her lack of response, frequent changes in contact information, and failure to confirm or attend scheduled visits at the Division's office. The caseworker also explained he had no concerns abouts Sherri's care for Theo after observing Theo at Sherri's home.

The second permanency caseworker testified about her involvement with the family from January 2022 to January 2024. While she acknowledged issues out of Amy's control related to the re-assignment of her therapists and virtual appointments, the caseworker stated Amy nonetheless never consistently engaged in the therapy recommended by the Division. She explained how she tried to meet with Amy, schedule family team meetings, work with her on

19

transportation issues, and help her identify barriers to attending appointments and engaging in court-ordered services. However, Amy was not always willing to engage and was difficult to contact. The caseworker also testified Amy had still not engaged in the recommended and court-ordered substance abuse treatment, had not progressed beyond supervised visits with Theo, still needed to participate in individual therapy, but consistently attended medication management visits by the end of that caseworker's involvement in January 2024.

Further, the caseworker testified she observed Theo to be a "rambunctious," yet "very sickly child." She explained the Division coordinated neurodevelopmental evaluations and genetic testing during her time on the case, which led to Theo's Hunter Syndrome diagnosis. She testified Sherri always coordinated with the Division and Theo's nurse to ensure Theo's medical and behavioral needs were met. The caseworker recounted the Division and Sherri worked together to enroll Theo in school and early intervention services. She explained Sherri was "very attentive" to Theo during her monthly visits to Sherri's home, Sherri and Theo had a good relationship, and Theo overall seemed to be "doing great" and was "very active" there.

The adoption worker testified about her involvement with the family from her assignment in January 2024 until the time of trial. She described efforts to

A-1691-24

engage Amy in required services, explaining the Division referred Amy to individual therapy at the YMCA after she began having difficulty at Stress Care. Despite this referral, the adoption worker testified Amy opted to use a different community provider, Positive Reset, with which she engaged for a few months beginning in April 2024 but later "missed a couple of appointments" and was subsequently placed on a "Do Not Schedule" list. The adoption worker explained she then put in another referral for Amy at the YMCA, where Amy would not have to pay for therapy, but Amy asked for a new therapist and was placed on a waiting list after attending a couple of sessions in September 2024. The adoption worker testified Amy was "not currently engaged" in therapy but was compliant with medication management at the time of trial.

The adoption worker further testified that while Amy did engage in an updated SAE in spring 2024, she was still unwilling to engage in the recommended level one substance abuse treatment through the time of trial. According to the adoption worker, Amy claimed to have obtained a medical marijuana card in 2024, and while she never observed Amy to be under the influence, she nonetheless smelled marijuana on Amy once or twice. With respect to supervised visits with Theo, the adoption worker noted Amy's attendance was inconsistent until twice-per-week therapeutic visits through the

YMCA began in April 2024. However, Amy later missed too many appointments with the YMCA causing her therapeutic visits with Theo to be reduced from twice per week to only once per week.

The adoption worker also confirmed Amy did not attend any of Theo's weekly enzyme treatments despite the Division providing her with bus and train passes to do so, at a cost of $386 per month to the Division.[5] Ultimately, the adoption worker emphasized the Division's ongoing concerns regarding Amy's ability to independently parent Theo, which included "a lack of stable housing," "lack of . . . employment," and "not completing any of the . . . [c]ourt-[o]rdered recommended services." These concerns ultimately led the Division to its conclusion termination was in Theo's best interests.

Dr. Brandwein testified as an expert in clinical and forensic psychology.[6] He testified he had previously conducted two separate psychological evaluations of Amy as well as bonding evaluations for both Amy and Sherri. Dr. Brandwein explained the purpose of his initial psychological evaluation in February 2022 was to assess Amy's parental competency and provide recommendations for

---

[5] The adoption worker also testified she offered to help Amy read the train and bus schedules, but Amy did not take advantage of the assistance.

[6] All parties stipulated to Dr. Brandwein's credentials and expertise.

services that would help Amy resolve the issues that led to the Division's involvement. He noted at that time Amy was unemployed, struggling to find stable housing, self-medicating her anxiety with marijuana, and had a substantial history of mental health difficulties. He expressed concern that Amy said she was not visiting Theo at that time because she preferred not to go to the Division's office, where she felt uncomfortable. He testified Amy's lack of visitation with Theo was concerning because visiting is the "way for a parent to maintain connection" to their child when that child is placed in resource care.

Dr. Brandwein testified he was concerned with Amy's marijuana use, given her reported history of hearing voices, and about her using marijuana around Theo due to his "serious and significant special needs." He testified he arrived at three main diagnoses for Amy: "bipolar one disorder severe with psychotic features"; chronic PTSD; and severe cannabis use disorder. Based on his evaluation, Dr. Brandwein testified he recommended only supervised contact between Amy and Theo because of his concerns related to Amy's untreated mental health, need for parenting education and suitable housing, and lack of visitation with Theo. He recommended, for reunification, Amy undergo psychiatric evaluation, individual therapy, a parenting education program, an updated SAE, and consistent visitation with Theo on a weekly basis.

A-1691-24

Regarding his July 2024 reevaluation of Amy, Dr. Brandwein noted Amy exhibited "patterns of inconsistent compliance, noncompliance, and non-benefit from Division services." He stated Amy's ability to safely parent any child was "completely dependent on consistent engagement in mental health services, medication management, [and] individual therapy," yet she did not appear to comprehend her long-term need for those services. Dr. Brandwein testified his opinion from his first evaluation—that Amy was incapable of independently parenting Theo—had not changed because he "did not see . . . a substantive change in [Amy]'s parental competency or psychological functioning" nor "resol[ution of] the issues that led the Division to remove T[heo] over three and a half years ago."

Dr. Brandwein next testified regarding the importance of stability for Theo, given his special needs. He stated Amy's failure to complete the substance abuse program was concerning, not as it pertained to her marijuana use, but as to her "stubbornness," and her belief that it was "too much"[7] signified she was "not willing to do what it takes to be reunified with T[heo]." Moreover, Dr.

---

[7] Dr. Brandwein specified the outpatient program Amy deemed "too much for her" would have required two hours of her time per week for twelve weeks.

A-1691-24

Brandwein highlighted the importance of Theo having spent most of his life in the care of Sherri, who is knowledgeable about his special needs.

Dr. Brandwein testified his "ultimate recommendation was for . . . the [c]ourt to award guardianship of . . . T[heo] to the Division." He reasoned children with special needs require "someone who is consistently attuned to that child, ready to respond to any emergent situations, and ready to do what needs to be done." Thus, Amy's refusal to attend substance abuse treatment because it required too much of her time was concerning because "[w]hat if there was something she needed to do for T[heo] that . . . she also felt took up too much of her time." He reasoned, "it's really the interaction between [Amy's] mental health needs and the lack of stability [for] . . . T[heo], who has a fatal disease [and] is going to have emergencies associated with it through [his] life."

Regarding the bonding evaluations, Dr. Brandwein testified about the "importan[ce] [for Theo] to have a caregiver who is going to be able to make [him] as comfortable as he possibly can be for however long he has." He testified although Theo was clearly comfortable and familiar with Amy, they nonetheless lacked a "secure bond." In contrast, Dr. Brandwein testified he found a "secure bond" between Theo and Sherri, highlighting Sherri's preparedness and knowledge of Theo's medical needs. He testified he observed

25

Theo initiate a hug with Sherri during their evaluation but did not see Theo approach Amy for similar affection during theirs.

Dr. Brandwein noted, "T[heo] is [going to] need a lot of educational, medical, [and] social . . . support to have the best quality of life he can have. And T[heo] not only needs a parent, he needs a care coordinator. That's not [Amy]. Not now and not in the foreseeable future." He stated "termination of [Amy's] parental rights w[ould] not cause more harm than good" to Theo and opined the Division should be awarded guardianship so Sherri may adopt Theo.

On January 21, 2025, the court issued an order of judgment and written decision. In its decision, the trial court first outlined the testimony provided at trial and its evaluation of each witness's credibility. It found the Division's four caseworkers to all be credible witnesses, specifically describing their testimonies as "straightforward," "forthright," "professional," and "supported by documentation in evidence." Specifically, the court found Sherri to be an "inherently believable" and "very credible witness." It emphasized her "straightforward" manner, lack of reluctance to answer questions, and that "her physical presence and tone reflected knowledge and a commitment to ensuring T[heo] receives the necessary medical care while doing so in a loving manner." The court credited Dr. Brandwein as a "very credible expert witness," describing

his testimony as forthright, professional, and detailed. It noted "[t]here were no contradictions in any aspect of his testimony" and that he showed no special interest in the case's outcome.

The court explained, as discussed more fully below, how the Division proved the four prongs of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence. Thus, the court granted the Division's application and terminated Amy's parental rights to Theo.

## II.

On appeal, Amy argues the trial court's judgment terminating her parental rights should be reversed because the record does not support the court's legal conclusions. Amy contends the court erred in concluding: (1) Theo's safety, health, or development has been or will continue to be endangered by his relationship with Amy; (2) Amy is unwilling or unable to remediate her perceived parenting issues; (3) the Division made reasonable efforts to provide services and that alternatives to termination were properly considered; and (4) terminating Amy's parental rights would not do more harm than good.

## A.

An appellate court's review of a decision "to terminate parental rights is limited." N.J. Div. of Child Prot. & Permanency v. C.J.R., 452 N.J. Super. 454,

468 (App. Div. 2017). This court affords substantial deference to the trial court's opportunity to have observed the witnesses first-hand and to evaluate their credibility. N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014). "Our general deference on appeal is also informed by the Family Part judge's 'feel of the case[,]'" N.J. Div. of Child Prot. & Permanency v. D.H., 469 N.J. Super. 107, 116 (App. Div. 2021) (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)), and by the Family Part's "special expertise in matters related to the family." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012). An appellate court will not reverse a termination decision when it is supported by "substantial credible evidence in the record." C.J.R., 452 N.J. Super. at 468. "Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." E.P., 196 N.J. at 104 (quoting N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007)).

The termination of parents' rights to raise their children is a matter of constitutional magnitude. In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). "Severing the ties between a child and a parent is . . . a weapon of last resort in the arsenal of state power." F.M., 211 N.J. at 447. As this court

articulated, "[a]fter the elimination of the death penalty, we can think of no legal consequence of greater magnitude than the termination of parental rights." In re Adoption of a Child by J.E.V., 442 N.J. Super. 472, 481 (App. Div. 2015).

A parent's right to raise their children, however, is "not absolute" but limited "by the State's parens patriae responsibility to protect children." F.M., 211 N.J. at 447. Because termination permanently severs the legal relationship between parent and child, it should be ordered only where "proof of parental unfitness is clear." Ibid. The burden is on the State to satisfy, by clear and convincing evidence, four factors outlined under the best-interests-of-the-child test:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights [TPR]; and
>
> (4) [TPR] will not do more harm than good.
>
> [N.J.S.A. 30:4C-15.1(a).]

These "four criteria are not discr[ete] and separate, but overlap with each other . . . to identify a child's best interests." N.J. Div. of Youth & Fam. Servs. v. A.G., 344 N.J. Super. 418, 434 (App. Div. 2001). The State must demonstrate a parent "has not cured the initial cause of harm and will continue to cause serious and lasting harm to the child." In re Guardianship of J.C., 129 N.J. 1, 10 (1992). "[A]ll doubts must be resolved against [TPR]." K.H.O., 161 N.J. at 347. The court must consider "not only whether the parent is fit, but also whether [they] can become fit within time to assume the parental role necessary to meet the child's needs." N.J. Div. of Youth & Fam. Servs. v. R.L., 388 N.J. Super. 81, 87 (App. Div. 2006).

B.

Amy argues the trial court erred in finding her relationship with Theo endangered his safety, health, or development under prong one, and its determination under prong two—that she was unwilling or unable to remediate such harm or provide a safe and stable home—is not supported by the record.

Under prong one, Amy argues the trial court improperly presumed she "willfully failed to address her perceived substance abuse and mental health issues, thereby endangering . . . Theo" because the record lacks evidence such failure endangered Theo. She contends her "status as a recreational marijuana

30

user cannot suffice as the sole or primary reason to terminate [a] parent's rights . . . unless the Division proves with competent, case-specific evidence" that it endangers the child, citing our holding in D.H. See 469 N.J. Super. at 113.

Amy argues the Division failed to prove her marijuana use endangered Theo, emphasizing her use was legal, limited to small amounts to help her sleep, that she never experiences a "high" from her use, was able to stop without treatment, and never used it in front of her children. She highlights she was forthcoming about her use, neither the Division nor Dr. Brandwein ever observed her to be under the influence, and the Division determined the substance abuse allegations against her were unfounded. Amy avers the Division removed Theo because she left him with a babysitter, not because of her marijuana use.

Amy next claims the trial court improperly concluded "her unaddressed mental health issues . . . have endangered and will continue to endanger T[heo]" because "[m]ental illness, alone, does not disqualify a parent from raising a child." See F.M., 211 N.J. at 450-51. Contrary to the court's findings, Amy contends she made substantial efforts to participate in mental health treatment and medication management, but asserts the Division failed to afford her a "meaningful opportunity" to address its concerns in therapy. Amy notes she had

31

been reassigned therapists and had therapists who failed to show, which she claims negatively impacted her progress.

Under prong two, Amy argues the trial court improperly based its conclusion—that she had failed to remediate the harm to Theo and was unable to provide a safe and stable home for him—on Dr. Brandwein's "unreliable opinion" and claims the court mischaracterized her reunification efforts. She avers the record reflects she completed the recommended parenting instruction, met with the Division's domestic violence liaison, participated in medication management, visited with Theo, and submitted to SAEs.

Amy claims any noncompliance resulted from the Division's failure to provide recommended services, inflexible visitation demands, and insufficient transportation accommodations. She claims the trial court's decision conflicts with legal precedent prohibiting discrimination against parents who require accommodations for their mental or physical conditions to improve their parenting. See N.J. Div. of Child Prot. & Permanency v. T.D., 454 N.J. Super. 353, 382-83 (App. Div. 2018) (holding the Division failed to provide reasonable services to a wheelchair-bound parent with multiple sclerosis when it did not account for her mobility issues and insisted she use a transportation provider it knew to be a problem for the mother). Amy also contends the court erred in

relying on Dr. Brandwein's opinion that there was no evidence of a bond between her and Theo because it was based on limited observations.

Prongs one and two "are related to one another, and evidence that supports one informs and may support the other as part of the comprehensive basis for determining the best interests of the child." In re Guardianship of DMH, 161 N.J. 365, 379 (1999). Under the first prong of N.J.S.A. 30:4C-15.1(a), "the Division must prove harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'" N.J. Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 25 (2013) (quoting K.H.O., 161 N.J. at 352). The "focus is on the effect of harms arising from the parent-child relationship over time on the child's health and development." K.H.O., 161 N.J. at 348. "To satisfy this prong, [the Division] does not have to wait 'until a child is actually irreparably impaired by parental inattention or neglect.'" F.M., 211 N.J. at 449 (quoting DMH, 161 N.J. at 383).

Prong two relates to parental unfitness. K.H.O., 161 N.J. at 352. It requires the Division to show a parent is unable or unwilling to correct the circumstances that led to the agency's involvement or that they cannot provide a safe and stable home for their child, thus delaying permanency. Id. at 348-49. The inquiry "centers on whether the parent is able to remove the danger facing

the child." F.M., 211 N.J. at 451 (citing K.H.O., 161 N.J. at 352). This prong "may be met by indications of parental dereliction and irresponsibility, such as the parent's continued or recurrent drug abuse, the inability to provide a stable and protective home, [and] the withholding of parental attention and care[.]" K.H.O., 161 N.J. at 353. "The determinative issue is whether the circumstances surrounding the parental relationship, including any relationships with [others], cause harm to the child." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 289 (2007).

Under prong one, the trial court found the Division had proven "T[heo]'s safety, health[,] or development has been and will continue to be endangered by the parental relationship" with Amy. The court reasoned Amy's "mental health and substance abuse issues remain unaddressed," since she essentially abandoned Theo in July 2021, despite the Division consistently offering opportunities over the three years following Theo's removal for her to do so.

The court relied on Dr. Brandwein's testimony regarding his updated 2024 psychological evaluation of Amy, in which he opined he could not endorse Amy as an independent caregiver for Theo, given his significant special needs, because she had not resolved the issues that previously led to his removal three years prior. The court noted Dr. Brandwein's evaluation found Amy continued

34

to lack sufficient housing for her children, consistent employment, failed to complete level one outpatient substance abuse treatment, and had not consistently complied with mental health treatments. It noted Dr. Brandwein's concern that Amy was only able to name one of her medications. It further noted his concern Amy was choosing to self-medicate with marijuana to address her anxiety and sleep, despite her diagnosis of "[b]ipolar [one] [d]isorder . . . with psychotic features." Thus, the court concluded Amy's "unaddressed mental health and substance abuse concerns that have caused T[heo] to remain in [Sherri's] care . . . since August 2021 have endangered and will continue to endanger T[heo]'s safety, health[,] or development."

Under prong two, the court found Amy was unwilling or unable to eliminate the risk of harm to Theo. It reasoned Amy's "unwillingness or inability to . . . address her substance abuse issues and mental health concerns" demonstrated "a continued lack of understanding by [Amy] regarding the harm that initially resulted in the Division assuming custody of T[heo], and her resistance to changing the harmful situation." It noted the Division had continuously provided Amy with "multiple opportunities to engage in and successfully complete substance abuse treatment and mental health treatment" over the three-year period, which Amy had failed to do.

Moreover, the court found Amy was also "unable or unwilling to provide a safe and stable home for T[heo], and the delay in permanency w[ould] add to the harm." It reasoned Amy remains unable to provide a safe and stable home for Theo due to her refusal to participate in the "numerous community resources and programs . . . which can assist with addressing housing issues." The court further noted Dr. Brandwein opined, based on his bonding evaluations, he did not see evidence of a secure bond between Theo and Amy because Theo did not look to Amy to fulfill parental functions. Thus, the court concluded "any further delay in permanency w[ould] only add to the harm" to Theo.

We conclude the record sufficiently supported the trial court's conclusion that the Division proved the first two prongs by clear and convincing evidence. Under the first prong, the trial court appropriately found Amy's "mental health and substance abuse issues remain unaddressed," despite three years of Theo living in a resource home. Under the second prong, the court likewise concluded Amy is unwilling and unable to remediate the harm to Theo, provide a safe and stable home for him, and that any delay in permanency for Theo will only add to his harm.

Contrary to Amy's argument, the trial court did not determine Theo would continue to be harmed solely based on Amy's recreational marijuana use or her

36

mental health diagnoses. Instead, the record clearly reflects the trial court's conclusions stemmed from Amy's failure to address her substance abuse or consistently engage in mental health treatment, with Division caseworkers and Dr. Brandwein's expert testimony highlighting her lack of consistent progress notwithstanding numerous referrals. Furthermore, Dr. Brandwein's concerns regarding Amy's marijuana use related to its impact on her mental health issues, such as hearing voices, which is why she was recommended to attend a level one treatment for her drug use, which she never completed.

Moreover, the court noted Dr. Brandwein, whom it deemed forthright and detailed in his testimony, established Amy continued to lack sufficient housing for Theo, lacked employment, had no means to support herself, and had not consistently complied with mental health treatment or substance abuse treatment while Theo languished in foster care. The record also supported the court's conclusion, by way of Dr. Brandwein's unrebutted testimony, Theo's Hunter Syndrome diagnosis required a stable and consistent caregiver, and Amy could not function as that independent caretaker.

We are satisfied the trial court did not err in determining Amy was unable to provide a stable home for Theo. We are also unpersuaded the Division failed to provide Amy sufficient opportunities to address her mental health issues. She

A-1691-24

inconsistently complied with recommended therapy and did not meaningfully participate, but more importantly did not significantly benefit from the services she attended. Furthermore, Amy never progressed beyond supervised visitation sessions. Thus, the trial court's findings under prongs one and two were amply supported by the evidence in the record.

C.

Amy argues the trial court erred in concluding the Division met its burden under part one of prong three because the Division failed to provide services reasonably designed to assist her and did not strive to overcome the barriers to services. She claims the Division denied her a meaningful opportunity to address her mental health and frustrated her efforts to maintain her relationship with Theo.

Amy also contends the Division failed to ensure she received the recommended type of therapy, despite her mental health being a central issue in this matter. She insists the Division's providers were either not qualified to provide appropriate therapy or had scheduling and attendance issues, undermining her good faith efforts towards reunification. Amy asserts she more consistently attended therapy after she began receiving treatment in the appropriate modality.

A-1691-24

Next, Amy argues the Division failed to provide her with reasonable transportation services, given its knowledge of her limitations. Specifically, she claims the Division made minimal efforts to assist her in the use of public transportation, despite knowing she lacked personal transportation and financial resources, and experienced anxiety about navigating the bus system for the first time. She notes, although the Division offered to help her learn how to read a bus schedule, it never offered to travel to her location or offered her any other options besides bus passes. Amy contends the Division's failure to provide sufficient transportation support caused her to miss or be late for visits. She also claims she was unable to attend Theo's weekly enzyme treatments because Sherri refused to offer her a ride, and the bus and train passes provided by the Division did not cover the entirety of her route.

Moreover, Amy claims, for the first time on appeal, the Division did not provide adequate transportation accommodations, given her sickle cell disease, which frequently causes severe pain and limited her ability to use public transportation. She asserts the Division failed to act in accordance with Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973. While the Division declined to continue offering Amy door-to-door transportation, deeming her a "worker safety concern" after the incident in

39

August 2021, Amy contends there "was no indication [she] continued to pose a risk."

Regarding part two of prong three, Amy argues the trial court erred in relying on Sherri's preference for adoption rather than considering the feasibility of KLG, which Amy claims was a viable alternative to termination the Division and the trial court failed to properly consider. She asserts the trial court "erroneously treated Dr. Brandwein's recommendation of adoption as dispositive" based on Sherri's preference for adoption. Amy notes Dr. Brandwein acknowledged Sherri's preference for adoption "certainly played a role" in his recommendation of adoption over KLG, but he would not have "st[ood] in the way" had Sherri agreed to KLG. She claims "Dr. Brandwein did not consider Sherri's testimony that, despite her stated preference for adoption, she would continue to care for Theo if the court ordered KLG."

Additionally, Amy also argues the Division overlooked other options that would have kept her and Theo together. She claims the Division failed to follow up with Sherri about an alleged offer she made back in July 2021, just a few weeks after Theo's removal, for both Amy and Theo to live with her. Amy further contends the Division failed to explore the options of either a safety protection plan or in-home parent support services, which she asserts "could

have provided [her] with sufficient guidance and oversight to allow Theo to remain safely in her care."

The third prong requires the Division to undertake "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home" and requires the court to consider "alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3). "Reasonable efforts" include, but are not limited to:

> (1) consultation and cooperation with the parent in developing a plan for appropriate services;
>
> (2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;
>
> (3) informing the parent at appropriate intervals of the child's progress, development, and health; and
>
> (4) facilitating appropriate visitation.
>
> [N.J.S.A. 30:4C-15.1(c).]

Courts do not measure reasonableness by the "success" of the efforts. N.J. Div. of Youth & Fam. Servs. v. J.S., 433 N.J. Super. 69, 90 (App. Div. 2013) (quoting DMH, 161 N.J. at 393). What is reasonable "depend[s] on the facts and circumstances of each case." R.G., 217 N.J. at 557.

A-1691-24

Regarding the second aspect of prong three, our jurisprudence recognizes two permanency options: KLG and adoption. N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 507-08 (2004) (citing N.J.S.A. 3B:12A-1). KLG is considered an alternative to termination of parental rights that offers permanency and stability to a child residing with a relative or kinship caregiver. See N.J. Div. of Youth & Fam. Servs. v. L.L., 201 N.J. 210, 222-25 (2010) (discussing the KLG Act and its intent). Unlike termination of parental rights, KLG does not cut off the legal relationship between a parent and child. N.J. Div. of Youth & Fam. Servs. v. S.V., 362 N.J. Super. 76, 87 (App. Div. 2003). The parent remains entitled to visitation and has the right to seek termination of guardianship and resumption of custody at a later date if the parent is able to provide a safe and secure home for the child. Ibid.

In cases involving alternatives to termination, the feasibility of appointing a KLG are considered under prong three. R.G., 217 N.J. at 558. A child's attachment to third parties "does not provide an independent basis for termination where the other standards have not been satisfied." G.L., 191 N.J. at 609. "Once [the caregiver] is provided with [the benefits and burdens of a KLG], the caretaker's preference between the two alternatives should matter." N.J. Div. of Youth & Fam. Servs. v. M.M., 459 N.J. Super. 246, 263 (App. Div.

42

2019). However, while the resource parent or caregiver's preference is relevant, it is not dispositive. Id. at 264.

Under part one of prong three, the court found the Division made reasonable efforts to provide services to Amy in support of reunification and considered alternatives to termination. The court found Amy's assertion that the Division did not make reasonable efforts to assist her "to be devoid of merit." It reasoned "throughout the past three years, [Amy] had been repeatedly referred for substance abuse evaluations . . . [and] treatment, assistance with housing, psychological and bonding evaluations, mental health treatment, transportation for visits, and supervised parenting time." The court noted, however, Amy had not used, engaged in, or successfully completed those services.

Regarding the second part of prong three—alternatives to termination— the court found: Sherri had been advised of and understood the differences between KLG and adoption; Sherri testified she would be open to contact with Theo's biological parents to keep them updated on Theo's life if she adopted him; and Sherri expressed her desire to adopt Theo and provide him with medical care and a stable living situation. The court noted Sherri testified she was not open to KLG and thus found there was no alternative plan to the termination of Amy's parental rights.

We affirm the trial court's decision with respect to prong three substantially for the reasons set forth in its comprehensive and thoughtful decision. We add the following. Although the Division concedes there were "some issues" finding Amy a qualified provider, as the court noted, she was inconsistent with her mental health treatment and never demonstrated she was capable of independently parenting Theo, despite the extensive services afforded to her. The Division made repeated referrals for SAEs, referring Amy at least three times. The Division also continued to re-refer Amy for mental health services after she was closed out for non-attendance. The record amply supports the trial court's conclusion the Division made reasonable efforts to provide Amy with services to remediate the harm that led to Theo's removal.

Likewise, the Division provided Amy with monthly bus and train passes after the Division determined it could no longer safely transport Amy. Moreover, the Division offered her assistance in navigating the bus and train schedules. With respect to Amy's argument the Division did not provide her with adequate transportation in light of her sickle cell disease, we note this issue was not raised before the Law Division and was only raised for the first time on appeal. We ordinarily decline to consider an issue not properly presented to the trial court unless the jurisdiction of the court is implicated or the matter concerns

an issue of great public importance. Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973). Neither circumstance is present in this matter. Nevertheless, we observe Amy never requested any accommodation for her sickle cell disease, and the record only contains a few instances of Amy claiming she was suffering from a related flare-up. Moreover, the record reflects Amy successfully utilized public transportation several times during the course of this litigation.

The Division placed Theo with Amy's cousin, Sherri, where he remained since removal. Moreover, Sherri unequivocally stated she understood the distinction between KLG and adoption and affirmed her commitment to adoption. She noted she desired to adopt Theo so she could provide him with stability and tend to his medical needs, and stated she would be open to maintaining contact with Amy after adoption. After considering alternatives, the court ultimately determined adoption was in Theo's best interests. We discern no basis to disturb the court's decision.

### D.

Amy next argues the trial court's termination of her parental rights should be reversed because the trial court's conclusion under prong four "rested on the unreliable opinion of [the Division]'s expert," Dr. Brandwein, which she contends was "incongruous with the facts in evidence." She claims Dr.

45

Brandwein assumed she was not compliant in medication management when the record reflected she was by the time of trial. Moreover, Amy contends Dr. Brandwein's support for termination did not account for the "numerous positive and appropriate" interactions she had with Theo.

Further, Amy claims, by deferring to Dr. Brandwein's opinion, the trial court effectively allowed Sherri's personal preference for adoption to control its conclusion, without weighing whether termination was actually in Theo's best interests or considering alternative outcomes that could similarly benefit Theo. She points to Dr. Brandwein's testimony that Theo would not be harmed by continued contact with her and that he would endorse KLG if Sherri agreed to it, and Sherri's testimony that she would continue to care for Theo even if the court ordered KLG.

Amy further asserts there is no credible evidence in the record showing Theo would be harmed by a relationship with her, "regardless of whether she is prepared to provide for his daily care." She argues the trial court ignored that Sherri was ultimately willing to engage in KLG if the court ordered it and claims the court's analysis "should have been informed by Theo's best interests and not Sherri's personal preference."

A-1691-24

Prong four of the best-interests test addresses whether termination "will not do more than good." N.J.S.A. 30:4A-15.1(a)(4). It "serves as a fail-safe against termination even where the remaining standards have been met." E.P., 196 N.J. at 108. "The question ultimately is not whether a biological mother or father is a worthy parent, but whether a child's interest[s] will best be served by completely terminating the child's relationship with that parent." Ibid. The question to be addressed "is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with [their] natural parents than from the permanent disruption of [their] relationship with [their] foster parents." K.H.O., 161 N.J. at 355. "[A] child's need for permanency is an extremely important consideration pursuant to this prong." R.G., 217 N.J. at 559.

"[A] child has a right to live in a stable, nurturing environment and to have the psychological security that [their] most deeply formed attachments will not be shattered." F.M., 211 N.J. at 453. But "[k]eeping the child in limbo, hoping for some long[-]term unification plan, would be a misapplication of the law." A.G., 344 N.J. Super. at 438. Accordingly, termination is appropriate when it "will result, among other things, in a permanent resolution of the child's status." N.J. Div. of Child Prot. & Permanency v. A.W., 103 N.J. 591, 610 (1986).

Similarly, "'termination of parental rights likely will not do more harm than good' where the child has bonded with the resource parents in a nurturing and safe home." N.J. Div. of Youth & Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 492 (App. Div. 2012) (quoting E.P., 196 N.J. at 108).

A court must also consider "the child's age, [their] overall health and development, and the realistic likelihood that the [biological] parent will be capable of caring for the child in the near future." K.H.O., 161 N.J. at 357. Although there is a "natural tendency to want to continue working with parents[,]" the Court has cautioned that courts "must not lose sight of time from the perspective of the child's needs." Ibid. "[T]he child's need for permanency and stability" is the "central factor." Ibid. Thus, "[t]he harm to children that results from a delay in achieving permanency and stability requires that limits be placed on the amount of time granted a parent to correct [their] unfitness in anticipation of possible future reunification with [their] children." N.J. Div. of Youth & Fam. Servs. v. S.F., 392 N.J. Super. 201, 214 (App. Div. 2007).

Regarding prong four, the court found the termination of Amy's parental rights would not do more harm than good to Theo. It found Theo had been with Sherri for most of his life, during which time Sherri provided him with a stable and safe home and consistently met all his needs, including the complex medical

care required for his Hunter Syndrome diagnosis. The court emphasized Theo's "secure bond" with Sherri, as observed by Dr. Brandwein during their bonding evaluation. In contrast, the court noted Amy had never been recommended for unsupervised visits with Theo, had never been endorsed by any expert as capable of independently managing Theo's significant special needs, and had never attended any of Theo's weekly enzyme treatments, despite the opportunity and support to do so. The court also credited Dr. Brandwein's observation there was no evidence of a secure bond between Amy and Theo, and Dr. Brandwein's uncontroverted opinion that termination of Amy's parental rights would not cause more harm than good.

We are unpersuaded by Amy's arguments and affirm for the reasons set forth by the trial court regarding prong four. We do not question whether there are some positive aspects of Amy's relationship with Theo. However, we discern no error in the court's determination that Amy does not have a secure bond with Theo and that severing her parental rights will not do more harm than good, based on Dr. Brandwein's opinion. Theo, on the other hand, shares a secure bond with Sherri, his primary caregiver over the past several years, who has helped him navigate the serious medical issues he has faced. Moreover, Amy was unable to ever progress beyond supervised visits and routinely failed

to consistently attend those visits, despite being encouraged to do so and being provided with transportation. More fundamentally, Dr. Brandwein noted Amy was incapable of independently caring for Theo's complex medical needs.

Contrary to Amy's assertion, the court did not merely rely on Dr. Brandwein's opinion or Sherri's preference as the sole basis for termination of her parental rights. The court properly considered and weighed Theo's respective bonds with Amy and Sherri based on the evidence presented at trial. Furthermore, simply because Sherri testified she would continue to care for Theo even if the court had ordered KLG does not demonstrate the court erred in finding the Division satisfied prong four. Rather, it revealed Sherri's commitment to caring for Theo regardless of the court's ultimate holding. In short, there was adequate, substantial, and credible evidence in the record to support the court's finding that termination of Amy's parental rights would not do more than good to Theo under prong four when Sherri has "provided stability and a safe home," and Amy remains unable to do so for the foreseeable future.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-1691-24